IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TERRY DENICE CAMARILLO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:16-CV-3285-M (BH) |
| | § | |
| NANCY A. BERRYHILL, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

By *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition.  Before the Court is *Plaintiff's Opening Brief*, filed May 30, 2017 (doc. 18), *Defendant's Response Brief*, filed June 29, 2017 (doc. 19), and *Plaintiff's Reply Brief*, filed July 19, 2017 (doc. 20).  Based on the relevant findings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I.  BACKGROUND[1]

### A.    Procedural History

Terry Denice Camarillo (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for disability insurance benefits (DIB) under Title II of the Social Security Act (Act) and for supplemental security income (SSI) under Title XVI of the Act.  (doc. 18 at 6.)  On April 9, 2013, Plaintiff filed her applications for DIB and SSI, alleging disability beginning on November 30, 2012.  (R. at 26, 50, 141-42.)  Her

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

claims were denied initially on June 27, 2013, and upon reconsideration on September 4, 2013. (R. at 175, 183.) On September 27, 2013, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (R. at 189.) She appeared and testified at a hearing on August 7, 2014, and at a supplemental hearing on April 6, 2015. (R. at 48-117.) On May 29, 2015, the ALJ issued a decision finding Plaintiff not disabled and denying her claims for benefits. (R. at 23-41.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on June 9, 2015. (R. at 22.) The Appeals Council denied her request for review on August 2, 2016, making the ALJ's decision the final decision of the Commissioner. (R. at 14-17.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

B.    **Factual History**

1.    **Age, Education, and Work Experience**

Plaintiff was born on February 1, 1974, and was 40 years old at the time of the initial hearing. (R. at 39, 54.) She had a high school education and could speak English fluently. (R. at 39, 54-55.) She had past relevant work experience as a data entry clerk, lab aid, information clerk, and medical records clerk. (R. at 39.)

2.    **Medical Evidence**

On March 3, 2012, Plaintiff arrived at Medical City Dallas Hospital by ambulance reporting chest pain and depression. (R. at 383, 386.) She reported that she felt like hurting herself but she did not act on that feeling and had no plan to do so. (R. at 386.) She stated that she arrived home after spending the day with her daughter and thought she had a panic attack because she "became very sad and started crying and breathing fast." (R. at 386.) She had experienced problems related to her daughter, work, and personal finances. (R. at 387.) Her exam was normal and it was

recommended that she stay for more testing, but she refused and was discharged. (R. at 386, 388.) Plaintiff stated that "she was not actually wanting to hurt herself and [did] not have plans to and was just feeling down earlier." (R. at 386.) She was oriented to person, place, and time, and rational and coherent; her abstract thinking was intact; and she showed no signs of psychosis, auditory or visual hallucinations, delusional thinking, suicidal or homicidal ideations, slurred speech, or tangential thinking. (R. at 386.)

From August 26, 2012 to August 29, 2012, Plaintiff was treated at Timberlawn Mental Health System (Timberlawn) for depression and thoughts of harming herself. (R. at 742.) After losing her job, insurance, and apartment, she had an increase in depressed thoughts and no hope for living. (R. at 742.) She admitted to "suicidal thoughts of harming herself or driving her truck off a bridge." (R. at 742.) While in treatment, she participated in group therapy and milieu, and she stated that "what she did was foolish and she wanted to be discharged to her family." (R. at 742.) Plaintiff was prescribed Zoloft 100mg and Risperdal 1mg, her suicidal thoughts abated, and she was discharged without suicidal thoughts or homicidal ideations. (R. at 742.) At discharge, she was diagnosed with major depressive disorder that was recurrent and severe with psychotic features. (R. at 743.)

On August 31, 2012, Plaintiff had a follow-up appointment at Dallas Metrocare Services (Metrocare). (R. at 440-42.) She underwent a psychiatric diagnostic interview exam with Natasha Gultery, APN, in which she reported sadness, depressed mood, anhedonia, crying episodes, difficulty falling asleep, irritability, and low energy that occurred most days of the week, starting in February 2012. (R. at 440.) She denied having suicidal or homicidal thoughts and reported a decrease in auditory hallucinations. (R. at 440.) She reported that she was having visual

hallucinations of "a man and woman after [her]." (R. at 440.) She also denied having paranoia, periods of persistent elevated mood, hyperactivity, and decreased need for sleep. (R. at 440.) She reported that on her current medication regiment of Zoloft 100 mg and Risperdal 1mg, she had a stable mood, and a decrease in hallucinations and depressive symptoms, although her symptoms became worse with stress. (R. at 440-41.) Plaintiff was adequately groomed, alert, and oriented times four. (R. at 441.) She exhibited withdrawn behavior, normal psychomotor activity, normal speech, psychosis, organized thought process, intact memory, normal attention, and a good mood with euthymic affect. (R. at 441.) She also had fair insight, judgment, and impulse control, and denied command hallucinations. (R. at 441.) Plaintiff was continued on her medications and started on Benadryl to help with her insomnia. (R. at 441.)

On September 11, 2012, Plaintiff met with Maria Luna-Wolfe, RN. (R. at 444-45.) She was not suicidal or homicidal, and did not exhibit any signs of paranoia, psychosis, or abnormal thought content. (R. at 444.) She was cooperative and friendly, but dysphoric, sad, and depressed. (R. at 444.) She also reported that she was sleeping adequately and taking her medications. (R. at 445.)

Plaintiff met with Nurse Gultery on September 28, 2012, and November 9, 2012. (R. at 446, 450.) She reported that she was feeling better and denied having suicidal or homicidal thoughts, paranoia, or auditory or visual hallucinations. (R. at 447, 451.) In September, she reported being stable on Zoloft 150mg and sleeping about five hours per night. (R. at 447.) In November, she reported difficulty staying asleep and reported sleeping about six hours per night. (R. at 451.) Nurse Gultery increased her Zoloft prescription, discontinued Risperdal and Benadryl at Plaintiff's request, and started her on Trazodone to treat her insomnia. (R. at 447, 451.)

On November 28, 2012, Plaintiff began behavioral therapy with Ana Trueba,

4

Paraprofessional.  (R. at 453-54.)  The objectives of the therapy were to: (1) get her "back up on [her] feet"; (2) help her "be able to control the voices and impulses that come to her mind"; and (3) decrease her isolation and withdrawal.  (R. at 453.)  Plaintiff reported that she understood how therapy worked and agreed to start therapy.  (R. at 454.)

Plaintiff had several follow-up appointments with Nurse Gultery from January 4, 2013 to June 28, 2013.  (R. at 456-57, 461-62, 465-66, 486-87, 491-92.)  She routinely reported auditory hallucinations but denied having paranoia, suicidal or homicidal thoughts, or command hallucinations.  (R. at 457, 462, 465, 487, 492.)  She stated that she lost her job because one day at work, she heard voices that "told [her] to steal a cell[]phone."  (R. at 457.)  She mostly reported that she was feeling better but she still continued to have depressive symptoms.  (R. at 457, 462, 465, 487, 492.)  She also reported feelings of psychosis and fatigue.  (R. at 456-57, 461-62, 465-66, 486-87, 491-92.)  In January, she reported visual hallucinations of "stuff crawling on th[e] floor" but denied experiencing visual hallucinations at her later appointments.  (R. at 457, 487, 492.)  Nurse Gultery initially resumed Plaintiff on Risperdal to treat her intermittent thought confusion, and continued her on Trazodone and Zoloft, but later increased Risperdal and Zoloft to decrease her psychosis and depressive symptoms.  (R. at 457, 462.)  Plaintiff reported that she was only sleeping four hours per night in April.  (R. at 446.)  Nurse Gultery discontinued Trazodone and started her on Remeron as adjunct to Zoloft for her depressive symptoms.  (R. at 466.)  She subsequently increased Remeron to further treat her depression.  (R. at 487, 492.)

On February 4, 2013, Plaintiff met with Nurse Luna-Wolfe and reported that she was still hearing voices telling her that she was "not good enough to go to work," and she was seeing "rats run[] across the floor."  (R. at 459.)  She was adequately groomed, cooperative, friendly, alert, and

euthymic, reported psychosis, and exhibited fair insight and judgment. (R. at 459.)

On April 13, 2013, Plaintiff was admitted to the emergency department of Parkland Hospital (Parkland) complaining of back pain, auditory hallucinations, and depression. (R. at 409, 411, 413.) Her mother reported that Plaintiff slept too much, and Fuad Khan, MD, noted that she could be experiencing daytime somnolence with poor nighttime sleep. (R. at 410.) Plaintiff was alert, oriented times three, cooperative, behaved appropriately, and had a good mood with no delusions, obsessions, overvalued ideas, or thoughts to harm herself or others. (R. at 416.) She reported voices, but Dr. Khan noted that the "voices" did not classically fit into the true description of auditory hallucinations and were more like loud thoughts. (R. at 416.) Her medications at the time included Risperidone, Sertraline, Mirtazapine, Hydrocodone-Acetaminophen, and Naproxen. (R. at 415.) The Mirtazapine was discontinued because it did not help with her insomnia and she was started on Melatonin. (R. at 410.) She was not found to be a danger to herself or others and discharged to her mother's home. (R. at 410.) That same day, Plaintiff underwent x-rays, which revealed a slight anterior compression deformity of the L3 vertebral body, of uncertain chronicity, and moderate degenerative disc disease at L5-S1. (R. at 417.) She returned to the emergency department on May 2, 2013, complaining of back pain with shooting pain down her right leg and associated numbness and weakness. (R. at 433.) She stated that she had been given a shot for her back pain that had helped in the past. (R. at 433.)

On April 16, 2013 and April 18, 2013, Plaintiff went to the Parkland Urgent Care Center (Urgent Care) complaining of back pain. (R. at 424, 429.) She reported severe pain at her first visit and was prescribed medication. (R. at 424, 426.) On her second visit, she reported back pain and requested more powerful medications because the medications she got at her previous visit did not

work.  (R. at 429.)  Her plan of care upon release consisted of taking NSAIDs, muscle relaxers, and Prednisone, and following-up with her primary care provider.  (R. at 431.)

On April 29, 2013, Plaintiff met with Stephanie Exum, a qualified mental health professional, for psychosocial rehabilitation.  (R. at 473.)  She reported that she had some depression at times, a history of manic symptoms leading to impulsive behaviors, loneliness, and anger, but no issues with sleep or appetite.  (R. at 473.)  She stated that her symptoms made it hard for her to keep a job and maintain relationships.  (R. at 473.)  She also reported that she was taking her medications but was not sure if they were helping; she wanted to try therapy.  (R. at 473.)  She was scheduled to begin weekly psychosocial rehabilitation, along with counseling, in order to help her learn to better manage her symptoms and improve her functionality.  (R. at 473.)

On May 3, 2013, Plaintiff met with Ket Davis, APN, and stated that she was doing "better than yesterday."  (R. at 475-77.)  She reported sadness, depressed mood, anhedonia, difficulty concentrating, difficulty falling asleep, and changes in appetite.  (R. at 476.)  Nurse Davis continued her on her medications but added Hydroxyzine 25mg to treat her anxiety.  (R. at 476.)

On June 22, 2013, at the request of Disability Determination Services (DDS), Plaintiff met with Barbara Susanne Fletcher, Psy. D., for a psychological consultive examination.  (R. at 479-84.)  Dr. Fletcher noted that Plaintiff's mother drove her to the appointment, and she reported living with her mother, having contact with family, and having a best friend.  (R. at 481-82.)  She reported symptoms of depression including tearfulness, sleep disturbance, decreased energy, decreased motivation, appetite disturbance, loss of interest in pleasurable activities, social withdrawal, irritability, and problems with concentration and memory.  (R. at 481.)  She stated that she heard voices that told her people were out to get her, she lost her job because the voices told her to steal

a telephone, and she sees "bugs and things" out of the side of her eye.  (R. at 481.)  She also reported

feeling calm when she worked because she worked nights, when there were not too many people

around.  (R. at 482.)  She stated that she could not handle visits by her sister and sister's five

children to their mother.  (R. at 482.)  She also could not handle going to the store without her

mother.  (R. at 482.)  Her symptoms were reportedly worse when she was without her medications,

which included Risperidone, Hydroxyzine, Mirtazapine, and Sertraline.  (R. at 482.)  Plaintiff

reported being able to care for her personal hygiene but lacking motivation to do so, and stated that

her mother did the cooking, cleaning, and shopping.  (R. at 482.)  She indicated that she spent her

time sleeping.  (R. at 482.)  She also reported that she had not used alcohol in about a month, but

the last time she drank, she was so drunk that she pulled her car over and fell asleep.  (R. at 482.)

She was able to state the month, day, and year, knew where she was, and could state the similarities

between a piano and a drum as well as a banana and an orange.  (R. at 483.)  Dr. Fletcher estimated

that her intelligence and knowledge were average.  (R. at 483.)  Dr. Fletcher diagnosed her with

major depressive disorder that was recurrent and severe without psychotic features, anxiety disorder,

and alcohol abuse, as well as a Global Assessment of Functioning[2] (GAF) of 48.  (R. at 484.)

On June 24, 2013, Susan Posey, Psy. D., a state agency medical consultant (SAMC),

completed a mental residual functional capacity (MRFC) assessment of Plaintiff based on the

medical evidence.  (R. at 125-27.)  She opined that Plaintiff was markedly limited in her ability to

understand, remember, and carry out detailed instructions, but was not significantly limited in any

other areas of understanding, memory, sustained concentration, or persistence, and no more than

moderately limited in the areas of social interaction and adaptation.  (R. at 125-27.)  Plaintiff could

---

[2] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *See Boyd v. Apfel*, 239 F.3d 698, 700 n.2 (5th Cir. 2001).

understand, remember, and carry out only simple instructions; make simple decisions; attend and concentrate for extended periods; interact adequately with coworkers and supervisors; and respond appropriately to changes in a routine work setting.  (R. at 127.)

On August 30, 2013, Veena Ghai, M.D., an SAMC, completed an MRFC assessment of Plaintiff based on the medical evidence. (R. at 151-53.) Dr. Ghai opined that Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions, but no more than moderately limited in her other abilities in the areas of understanding, memory, sustained concentration, persistence, social interaction, and adaptation.  (R. at 152-53.)  Plaintiff could understand, remember, and carry out only simple instructions; make simple decisions; attend and concentrate for extended periods; interact adequately with coworkers and supervisors; and respond appropriately to changes in a routine work setting.  (R. at 153.)

Plaintiff met with Laura Settlage, APN, multiple times from September 18, 2013 to May 7, 2015. (R. at 495-97, 581-83, 596-98, 618-20, 627-29, 637-39, 642-44, 646-48, 712-14, 725-27, 810-12, 815, 820-22, 827, 847-49, 912-14, 943-45, 953-55, 962-64, 969-71, 976-78.)  Throughout her visits, Plaintiff reported that her depressive symptoms decreased and denied having suicidal or homicidal thoughts, but she continuously experienced demeaning auditory hallucinations.  (R. at 496, 582, 597, 619, 628, 638, 643, 647, 827, 963, 970, 977.) She reported that she was still suffering from depressive symptoms at several of the appointments.  (R. at 628, 638, 643, 827.)  Nurse Settlage routinely noted that Plaintiff reported experiencing initial and middle insomnia, sleeping only a few hours at night, or not sleeping at all.  (R. at 496, 638, 643, 811, 821, 827.)  On other occasions, however, Plaintiff reported sleeping well.  (R. at 582, 619, 848, 944.)  On December 3, 2013, she reported that she was going to bed at 10:00 p.m., waking up at 9:30 a.m., and not taking

naps during the day because she had a lot to do. (R. at 619.) On February 25, 2014, her mother reported that she was not telling Nurse Settlage everything about her sleep, to which Plaintiff agreed, because she would actually sleep all the time and only get out of bed at 12:50 p.m. to watch General Hospital. (R. at 628.)

Plaintiff's medications were continuously altered throughout her visits with Nurse Settlage. (R. at 496, 582, 619, 628, 638, 643, 726, 811, 815.) Nurse Settlage first changed Plaintiff's Risperdal to Geodon to target her psychosis, increased Gabapentin for anxiety, and added Benadryl for insomnia. (R. at 496.) Plaintiff reported "sleeping [six] hours with the Benadryl" but still had initial and middle insomnia. (R. at 582.) She was then taken off Geodon and Risperdal, and prescribed Olanzapine for psychosis. (R. at 582.) Nurse Settlage increased the Olanzapine, began Plaintiff on Topamax for her depressive symptoms and Doxepin for insomnia, and discontinued Diphenhydramine and Benadryl. (R. at 619, 622.) Plaintiff was also prescribed Wellbutrin to help target her depressive symptoms, and subsequently prescribed Ambien to help with her insomnia. (R. at 628, 638.) She then started a trial of Geodon to treat the auditory hallucinations. (R. at 643.) Plaintiff had also been taking Thorazine, but it was discontinued after she reported that it was "too much" and made her "dopey all day." (R. at 726.) Nurse Settlage added Gabapentin to treat her anxiety and Temazepam for insomnia, but she reported vivid nightmares with Temazepam and was instructed to quit taking it. (R. at 811, 815.) Plaintiff reported sleeping twelve hours at night on Doxepin, and her dosage was increased. (R. at 944.) Nurse Settlage also extensively discussed the importance of sleep hygiene with Plaintiff and the need to discontinue her day time napping in order to get into a normal sleep pattern. (R. at 638, 821.) On October 7, 2014, however, her mother reported that sleep hygiene remained a problem. (R. at 847-48.)

On March 18, 2014 and April 2, 2014, Plaintiff attended individual counseling during which she noted that she was ready to get a job. (R. at 635, 640.)  During the March session, she reported that she had been awake for four days with only a one-hour nap, her mind raced and would not stop, and she was experiencing paranoid delusions and thought people were out to get her. (R. at 635.) She had auditory hallucinations that occurred mostly at night, telling her that she was "stupid" and did not need a job, and commanding her to hurt herself. (R. at 635.)  She also reported that she had a depressed mood most days, anxiety when around others, changes in appetite, feelings of worthlessness and hopelessness, anhedonia, suicidal thoughts twice a day, problems with family, and difficulties in activities of daily life. (R. at 635.)  During the April session, Plaintiff presented with appropriate affect, hygiene, and appearance and reported she was sleeping better on her medication, but was still having auditory hallucinations and paranoid delusions. (R. at 640.)  She reported a decreased depression level from her prior visit. (R. at 640.)

On May 16, 2014, Plaintiff was admitted to Baylor Hospital (Baylor) after taking a large quantity of prescription medications in an attempt to harm herself. (R. at 653, 664.)  She was deemed to be a moderate to high suicide risk after affirming that in the past week, she wanted to sleep and not wake up, had a plan to commit suicide, and intended to carry it out. (R. at 654.)  She stated that she attempted to harm herself after she did not receive a call back from her psychiatric doctor. (R. at 664.)  She later reported to Nurse Settlage that she was previously having a good day but the "voices told [her] to take all [her] medications." (R. at 713.)

She was referred from Baylor to Green Oaks Hospital where she was treated from May 17, 2014, to May 18, 2014. (R. at 689.)  She stated that when her psychiatrist did not call her back, two squirrels told her to take the medications. (R. at 694.)  She was regretful that the overdose was not

11

successful.  (R. at 694.)  She noted that she had been depressed for a while, and the medications that were previously helping her sleep were no longer working.  (R. at 694.)  She also noted that some days she only wanted to sleep.  (R. at 690.)  Plaintiff started doing better and was discharged from the hospital.  (R. at 700.)  She was prescribed Thorazine, which was later discontinued because it made her feel "dopey all day."  (R. at 701, 706, 726.)

Plaintiff underwent psychosocial rehabilitation with Vesha Akao, a qualified mental health professional, multiple times from June 3, 2014 to September 25, 2014.  (R. at 723-24, 729-30, 731-32, 636-38, 806-09, 813-14, 817-18, 825-26, 828-29, 836-38, 843-44.)  During her first session, she reported that she attempted suicide and went to Baylor and then Green Oaks Hospital.  (R. at 724.)  She identified depressive symptoms of "not sleeping, feeling down, fatigue[d], thinking about death, and no interest[s]."  (R. at 724.)  She felt "like sometimes folks [were] out to get [her]" and did not feel safe going outside.  (R. at 724.)  At her next session, she reported hearing voices telling her to go to Timberlawn.  (R. at 730.)  During the following session, she was "so sleepy" and stated she was hearing voices telling her "do[ not] go to sleep or someone will break in."  (R. at 731.)  She also reported during another session that she just wanted to sleep during the day and could not sleep at night.  (R. at 806.)  She later reported sleeping better after receiving her medications.  (R. at 817.)  She began reporting that she was doing better during the final sessions.  (R. at 826, 836, 838, 843.)

On June 20, 2014, Plaintiff went back to Nurse Gultery and stated that she was not sleeping. (R. at 733-35.)  She reported difficulty falling asleep, increased paranoia, low energy, and difficulty concentrating.  (R. at 734.)  She had not slept "[ten] hours in [four] days."  (R. at 734.)  She also continued to report auditory hallucinations of voices telling her someone was going to break into the house, as well as visual hallucinations of "shadows and bugs."  (R. at 734.)  Nurse Gultery

12

discontinued her Ambien prescription, increased her Doxepin and Zyprexa, and continued her other medications.  (R. at 734.)

On August 27, 2014, A. Mirzatuny, M.D., and Nurse Settlage, completed a "Medical Assessment of Ability to do Work-Related Activities (Mental)" for Plaintiff.  (R. at 799-801.)  Dr. Mirzatuny diagnosed her with major depressive disorder with recurrent, severe psychotic features. (R. at 800.)  Dr. Mirzatuny opined that Plaintiff had "extreme loss of ability to perform" in the following categories: performing at a consistent pace without an unreasonable number and length of rest/break periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; and finishing a normal work week without interruption from psychologically based symptoms.  (R. at 799-800.) Dr. Mirzatuny also opined that Plaintiff had "substantial loss of ability to perform" in the following categories: understanding to carry out detailed but uninvolved written or oral instructions; maintaining concentration, attention, and staying on task for an extended period (being two hours); acting appropriately with the general public; asking simple questions or requesting assistance; maintaining personal appearance; behaving in an emotionally stable manner; and coping with normal work stress without exacerbating pathologically based symptoms.[3] (R. at 799-800.) Plaintiff would be expected to be absent from work more than 4 days a month, and it was unlikely that her mental disorders would exacerbate the degree of disability from her physical impairments.  (R. at 801.)

---

[3] Dr. Mirzatuny also opined that Plaintiff had "some loss of ability to perform" in the following categories: understanding to carry out simple one or two-step instructions; demonstrating reliability by maintaining regular attendance and being punctual within customary tolerances; and making simple work-related decisions.  (R. at 799-800.)

On November 19, 2014, Plaintiff saw Mahmood Panjwani, M.D., P.A., for a physical examination. (R. at 917-28.) He found that she had chronic low back pain, and imaging studies revealed degenerative disc disease. (R. at 920.) Her weight aggravated and contributed to her back pain. (R. at 920.) He also noted that she suffered from major depression and schizophrenia, which she reported was more limiting than her back pain. (R. at 920.)

On December 3, 2014, Plaintiff met with Terry Metzger, a qualified mental health professional, for psychosocial rehabilitation. (R. at 947.) The objective was to teach her about mental illness and coping skills to manage depression, anxiety, and stress through individual and group skills training. (R. at 947.) She reported that medication was helping reduce her hallucinations, although she still received command hallucinations telling her not to get out of bed. (R. at 947.) Overall she was in a content mood with a relaxed and smiling affect, and she was motivated to manage and reduce her behavioral symptoms. (R. at 947.)

Plaintiff met with Nurse Settlage on January 20, 2015, February 27, 2015, April 9, 2015, and May 7, 2015. (R. at 953-54, 962-64, 969-71, 976-78.) In January, Plaintiff reported that her appetite and sleep were good, she had stopped taking all pain medications, and was walking a mile a day, stopping only twice. (R. at 954.) She was also planning to go play Bingo on her birthday. (R. at 954.) She was still having auditory hallucinations and told her home-visit case manager to stop visiting her because the hallucinations wanted her to hurt him. (R. at 954.) During the February session, she reported that she was still having auditory hallucinations and no longer walking, but her appetite and sleep were good. (R. at 963.) During the April session, she stated that she would fall asleep in her chair but would wake up when she went to bed. (R. at 970.) She also reported taking a trip to Phoenix with her friend and flying on a plane for the first time. (R. at 970.) Nurse Settlage

instructed her to take her Doxepin when she went to bed and continued her other medications.  (R. at 970.)  During the May session, Plaintiff reported that she was having weird dreams, negative thoughts, and auditory hallucinations.  (R. at 977.)

On June 10, 2015, Plaintiff was admitted to the Parkland emergency psychological department with suicidal ideation.  (R. at 999-1001.)  She also had homicidal ideation and auditory hallucinations.  (R. at 1001.)  She stated that "the voices [were] telling [her] to hurt everybody."  (R. at 1001.)  These symptoms were a result of her finding out that she was denied social security and that her mammogram was abnormal.  (R. at 1001, 1003.)  She reported that her medications were not helpful, and she was still having problems with sleep and hallucinations despite taking Doxepin and Olanzapine.  (R. at 1006.)  She was instructed to begin taking her Zoloft in the daytime and discharged home.  (R. at 1009.)

### 3.    Hearing Testimony

On August 7, 2014, Plaintiff and her mother testified at a hearing before the ALJ.  (R. at 48-84.)  On April 6, 2015, Plaintiff and a vocational expert (VE) testified at a supplemental hearing before the ALJ.  (R. at 85-117.)  Plaintiff was represented by a non-attorney representative at each hearing.  (R. at 50, 87.)

#### a.    *Plaintiff's Testimony*

At the first hearing, Plaintiff testified that she was 40 years old, single, left-handed, a high school graduate, and did not have any dependent children under the age of 18.  (R. at 54-55.)  She had not worked since November 2012.  (R. at 54-55.)  She last worked processing medical specimens for approximately five months but had not previously performed that sort of work.  (R. at 55.)  She was fired after stealing a cell phone because "voices told her to steal."  (R. at 55.)

15

Before that, she worked at "Quest Diagnostic as a histology lab aide" for five years. (R. at 56.) She quit because she was going through a divorce, and also needed to take care of her 18-year-old daughter, who had suicidal thoughts. (R. at 56.)

Upon questioning by her representative, Plaintiff stated that she had already left her job with Quest Diagnostics when she was admitted to Timberlawn in August 2012, for chest pain and suicidal thoughts. (R. at 58, 66.) She also began living with her mother in 2012, when she was going through a divorce and lost her apartment and car. (R. at 59.) She had not looked for work since November 2012, because when she did, "the voices were tremendously negative to [her]" and they took over if she went to an interview. (R. at 67.) The voices told her she was stupid, could not hold down a job, and would not be hired. (R. at 67.) Plaintiff began treatment at Metrocare in August 2012, after her treatment at Timberlawn. (R. at 58.) Her mother drove her to her appointments; she did not use public transportation. (R. at 63.) She had a caseworker that would visit her at home every week to teach her coping skills on how to deal with the voices she was hearing. (R. at 58-59.) She had not been able to do anything to stop the voices. (R. at 60.) She heard voices and was scared to leave her home the morning of the hearing. (R. at 59.) Her medications were not helpful, and she had "good days and bad days," although "more bad days than good days." (R. at 59-61.) On a good day, the voices stopped tremendously, and she would shower and get up and try to help her mother clean the house; on a bad day, she would not shower due to pain in her back, and would lock herself in her bedroom because she had anxiety and did not want to be bothered. (R. at 60-61.) She also testified that she had major depression, and would sleep all day, only waking up to eat and then going "straight back to sleep" on a good day; on a bad day, she just locked herself in her room and did not come out to eat. (R. at 62.) When she was awake, she sat in her chair and watched

television because it hurt to move, and she did not help her mom around the home.  (R. at 62, 68.)
She occasionally fell asleep in her chair.  (R. at 68.)  She did not go out and stuck to herself because
she had anxiety and thought people were out to get her.  (R. at 62-63.)  She was hospitalized at
Baylor and then admitted to Green Oaks Hospital in May after taking all of her medications in an
attempt to harm herself because the "voices told [her] to take all of them."  (R. at 60.)  Her mother
began controlling her medications after her suicide attempt.  (R. at 61.)  Since she began treatment
at Metrocare, she felt the same because she still heard voices and was still "real depressed on days."
(R. at 68.)

        Plaintiff testified that she was heavy most of her life and had back and knee problems related
to her weight.  (R. at 74-75.)  She had gastric bypass surgery and went from over 500 pounds down
to 220 pounds, but at the hearing she weighed about 350 pounds.  (R. at 75-76.)  She testified about
an incident where she ended up at Parkland because she was drinking heavily and passed out on the
side of the road, but she stated she was no longer drinking.  (R. at 76-77.)  As for her sleeping
problems, there were "three or four days there that [she] did[ not] go to sleep at all."  (R. at 78.)  Her
doctor prescribed sleeping medication, and it was working, but her doctor discontinued it and
prescribed a different one after her overdose.  (R. at 78.)  She could sleep "about five or six hours"
at night and be in deep sleep on the new medication.  (R. at 78.)  She also took daytime naps even
though doctors asked her to stop taking naps.  (R. at 78-79.)  She tried not taking naps for two or
three days but "was just so drained and in pain of sitting [she] had to go lie down."  (R. at 79.)
When asked about the side effects of her medications, she testified that she did not have any that she
was aware of.  (R. at 79.)

        At the supplemental hearing, the ALJ questioned Plaintiff regarding the SAMC's opinion

of her capabilities at a job.  (R. at 92-95.)  Plaintiff disagreed with the entirety of the SAMC's opinion, and also stated that she would not be reliable to attend a job and would probably miss four days per week.  (R. at 93-97.)  Her normal day consisted of waking up around 7:00 a.m., watching television until noon, taking a nap, returning to watch television after her nap, and going to bed around 10:00 p.m.  (R. at 95-96.)  She had difficulty sleeping at night, took a sleeping pill, and slept about six hours a night.  (R. at 96.)  Although she went to bed at 10:00 p.m., she was not actually sleeping because she would toss and turn due to back pain; she would get up at 7:00 a.m., and by midday she was ready to nap.  (R. at 107.)  She was only actually getting maybe four or five hours of sleep at the most.  (R. at 108.)  She did not have any side effects from her medications.  (R. at 96.)

Plaintiff's representative questioned her, and she stated that she heard voices and saw things or people, and Metrocare tried a lot of different medications, but her symptoms were about the same. (R. at 99.)  She also had her caseworker visiting her at home, but the "voices were telling her to hurt him so [she] told him not to [go] back."  (R. at 101.)  She had chronic pain and was taking Naproxen, Gabapentin, and Menthocarbamol for pain but did not experience any side effects from those medications.  (R. at 102-03.)  She testified that her "psychotic features" and the voices would cause the most interference if she worked.  (R. at 105.)

### b.    *Mother's Testimony*

Plaintiff's mother testified that Plaintiff heard things, saw things, and would only leave the house to go to the doctor because she thought people were out to get her.  (R. at 70.)  They slept together a lot of times because Plaintiff was scared to sleep alone.  (R. at 70.)  She stated that the voices told Plaintiff that people were out to get her and told her to overdose on her medication.  (R. at 71.)  Plaintiff also had back injuries and could hardly move.  (R. at 71.)  She only helped fold

clothes "once in a while" and spent her waking hours mostly watching television in the living room. (R. at 71.)  Plaintiff slept more than anything, did not make her own meals, and did not bathe every day.  (R. at 71, 73.)  Plaintiff's attitude was the same or worse since starting treatment.  (R. at 72.)

        **c.**       ***VE's Testimony***

The VE testified that she had reviewed the vocational information in Plaintiff's file and determined that she had the following past relevant work experience: sales representative driver, DOT 292.353-010 (SVP 3, medium); outside deliverer, DOT 230.663-010 (SVP 2, light); medical records clerk, DOT 245.362-010 (SVP 4, light); and specimen processor, DOT 078.367-014 (SVP 4, light).  (R. at 109.)

The ALJ asked the VE to consider a hypothetical individual the same age, education, and work history as Plaintiff.  (R. at 110.)  The hypothetical individual could lift and carry 20 pounds occasionally and 10 pounds frequently; stand/walk for six hours of an eight-hour workday and sit for six hours of an eight-hour work day, both with normal breaks and rest periods; push, pull, and operate hand or foot controls without limitation; occasionally balance, stoop, kneel, or crouch but not climb ladders, ropes, or scaffolds; carry out simple, routine, repetitive tasks consistent with unskilled work; and work with little judgment required under simple and direct supervision, with no more than occasional contact with the general public and coworkers.  (R. at 110.)  The hypothetical individual would also be limited to few workplace changes.  (R. at 110.)

The ALJ asked the VE if that hypothetical individual would be able to perform any of Plaintiff's past work, either as the Plaintiff did, or as it was generally performed in the economy. (R. at 110.)  The VE answered no.  (R. at 111.)  The ALJ asked if the VE could identify other jobs the hypothetical individual could perform.  (R. at 111.)  The VE opined that the hypothetical person

could be a garment bagger, DOT 920.687-018 (SVP 2, light), with approximately 332,600 jobs nationally, and about 18,500 jobs in Texas; a cleaner/housekeeper, DOT 323.687-017 (SVP 2, light), with approximately 391,850 jobs nationally, and 32,140 jobs in Texas; or a laundry folder, DOT 369.687-018 (SVP 2, light), with about 90,500 jobs nationally, and just over 5,800 jobs in Texas. (R. at 111.)

The ALJ asked the VE to consider the same hypothetical, but to add a sedentary exertional level limitation. (R. at 111.) The VE opined that this hypothetical person could be a final assembler, DOT 713.687-018 (SVP 2, sedentary), with about 29,800 jobs nationally, and 1,590 jobs in Texas; a printed circuit board layout, DOT 017.684-010 (SVP 2, sedentary), with an estimated 29,800 jobs nationally, and 1,590 jobs in Texas; or a document preparer, DOT 249.587-018 (SVP 2, sedentary), with approximately 102,560 jobs nationally, and 7,140 jobs in Texas. (R. at 112.)

The ALJ asked the VE if it would preclude all full-time competitive work in the economy if the hypothetical individual with the same background as Plaintiff was limited to occasionally lifting and carrying 10 pounds; standing/walking for about 30 minutes of an eight-hour workday; and sitting for about 30 minutes of an eight-hour work day. (R. at 112-13.) The VE answered yes. (R. at 113.)

The ALJ asked if a hypothetical individual, with the same background as Plaintiff, would be precluded from full-time gainful employment in the economy if she had the loss of ability to perform at a consistent pace without an unreasonable number and length of rest periods and breaks, and finish a normal work week without interruptions from those symptoms. (R. at 113.) The VE responded affirmatively. (R. at 113.)

The ALJ then asked if the hypothetical individual would be precluded from gainful

20

employment if she had a combination of impairments, and extreme loss of the ability to accept instructions; respond appropriately to criticism from supervisors; get along with coworkers and peers without unduly distracting them; and respond appropriately to changes in a routine work setting. (R. at 113.)  The VE answered yes.  (R. at 113.)

Plaintiff's representative asked the VE if there was any tolerance for absenteeism for a hypothetical worker, who due to psychological impairments, was limited to SVP 1 or 2, unskilled work only.  (R. at 114.)  The VE responded that the tolerance would be up to one day per month at the maximum, but many jobs do not permit absenteeism in the first 90 days of employment.  (R. at 114.)  He then asked whether there is any tolerance for time off task aside from normal work breaks for unskilled work, SVP 1 or 2.  (R. at 115.)  The VE responded that about 10 percent is generally tolerated.  (R. at 115.)  Lastly, the representative asked whether the jobs of final assembler, printed circuit board layout, or document preparer required strict quotas or forced-pace production rates. (R. at 115.)  The VE stated that about 50 percent of final assembler and circuit board jobs do not have more astringent production pace, and that the document preparer will also have some expectations that should be completed in an eight-hour day.  (R. at 115.)  The VE opined that the number of jobs under those circumstances would be reduced up to 50 percent.  (R. at 115.)

C.    **ALJ's Findings**

The ALJ issued his decision denying benefits on May 29, 2015.  (R. at 26-41.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 30, 2012, the alleged onset date.  (R. at 28.)  At step two, the ALJ found that she had the following severe impairments: degenerative disc disease of the lumbar spine, obesity status-post surgery, and affective disorder. (R. at 28.)  Despite those impairments, at step three, the ALJ found that Plaintiff

had no impairments or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (R. at 34.)

Next, the ALJ determined that Plaintiff retained the RFC to perform the following: lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit six hours in an eight-hour workday; stand/walk six hours in an eight-hour workday; occasionally balance, stoop, kneel, and crouch but not climb ropes, ladders, or scaffolds; understand, remember, and carry out no more than simple, routine tasks; and occasionally have contact with the general public. (R. at 36.)

At step four, the ALJ determined that Plaintiff was unable to perform any of her past relevant work. (R. at 39.) At step five, the ALJ relied on the VE's testimony to find her capable of performing work that existed in significant numbers in the national economy, including jobs such as garment bagger, cleaner/housekeeper, and laundry folder. (R. at 40.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from the alleged onset date of November 30, 2012, through May 29, 2015. (R. at 40.)

## II.  ANALYSIS

### A.  Legal Standards

#### 1.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558,

564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

### 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**      <u>**Issues for Review**</u>

Plaintiff presents one issue for review:

24

A finding a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that [s]he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job she finds for a significant period of time. [Plaintiff] introduced evidence of excessive daytime sleep and absences from work, which the vocational expert testified would preclude competitive employment[.] Was the Administrative Law Judge's residual functional capacity [determination] supported by substantial evidence if he failed to acknowledge and evaluate [Plaintiff's] ability to sustain work?

## C.    <u>Residual Functional Capacity</u>

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because he failed to make specific findings regarding her ability to sustain employment despite her excessive sleep.  (doc. 18 at 23-26.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1).  The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam).  The relevant policy interpretation regarding the RFC determination states:

1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. . . .

SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).

Here, before proceeding to step four, the ALJ determined that Plaintiff had the RFC to lift,

carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit for six hours in an eight-hour workday; stand/walk for six hours in an eight-hour workday; occasionally balance, stoop, kneel, and crouch but not climb ropes, ladders, or scaffolds; understand, remember, and carry out no more than simple, routine tasks; and occasionally have contact with the general public.  (R. at 36.)  The ALJ gave considerable weight to the opinions of SAMCs Posey and Ghai, finding that their opinions were credible, and consistent with the medical evidence.  (R. at 38-39.) The ALJ also considered Plaintiff's testimony, the opinion of Plaintiff's treating physician, Dr. Mirzatuny, and the medical record evidence from Parkland and Metrocare.  (R. at 36-38.)

### 1.    Ability to Sustain Employment

Plaintiff asserts that the ALJ was required to make a specific finding that she can maintain employment because she presented evidence that her "daytime napping is the type of limitation which would affect her ability to hold a job."  (doc. 18 at 26.)

A finding that a social security claimant is able to engage in substantial gainful activity requires "more than a mere determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time."  *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986); *see also Leidler v. Sullivan*, 885 F.2d 291, 292-93 (5th Cir. 1981).  This requirement extends to cases involving mental as well as physical impairments.  *Watson v. Barnhart*, 288 F.3d 212, 217-218 (5th Cir. 2002).  The ALJ is not required in every case to make specific and distinct findings that the claimant can maintain employment over a sustained period, however.  *Frank v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005).  An RFC determination itself encompasses the necessary finding unless the claimant's ailment, by its nature, "waxes and wanes in its manifestation of disabling

symptoms." *See id.*; *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005). A specific finding is required if there is "evidence that [the] claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC." *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003). Allegations that an impairment causes good days and bad days do not by themselves require an explicit finding on the ability to maintain employment. *See Perez*, 415 F.3d at 465.

Plaintiff asserts that her and her mother's testimony showed that slept a large part of the day, and the medical records indicated she had sleeping difficulty. (doc. 18 at 22-23.) She also contends that medical record notes contradict a finding that her sleep was controlled by her medications. (doc. 18 at 27.) The medical records and Plaintiff's testimony reflect that she reported sleeping better on her medications, however. (R. at 78, 582, 640, 817.) She also indicated on several occasions that she was sleeping better and had no issues with sleep, regardless of medication. (R. at 445, 473, 582, 619, 817, 848, 944, 954, 963.) Further, Nurse Settlage extensively discussed the importance of sleep hygiene with Plaintiff and advised her to stop taking her daytime naps in order to get into a better sleep schedule, but Plaintiff testified that she continued to nap. (R. at 78-79, 638, 821.) Although the record shows an unstable sleep pattern, there is no evidence that her sleep patterns waxed and waned in a manner that precluded employment. (*See* docs. 18 at 27-28; 20 at 4-5.) Plaintiff's own testimony revealed that she believed her "psychotic features" and "voices", rather than her sleep habits, would cause the most interference if she worked. (R. at 105.) Moreover, Plaintiff cites no legal authority to support a finding that her need to nap was the type of limitation that would affect her ability to maintain employment. (*See* docs. 18; 20.)

Because Plaintiff did not present evidence that her ability to maintain employment was compromised, or that the ALJ did not appreciate that the ability to perform work on a regular and continuing basis was inherent in the definition of RFC, an express finding by the ALJ was not required and remand is not required on this issue.

### 2.    Plaintiff's and Her Mother's Testimony

Plaintiff asserts that the ALJ did not evaluate her testimony and that of her mother about her excessive sleep and explain his reasons for "rejecting her statements about daytime naps." (doc. 18 at 26-27.) His decision specifically noted her testimony that she usually sleeps thirteen hours a day because of her medications. (R. at 37.) In evaluating her statements concerning the intensity, persistence, and limiting effects of her symptoms, the ALJ considered the medical records from Metrocare wherein Plaintiff reported improved sleep with medication,[4] playing Bingo on her birthday, taking a trip with her best friend, and walking a mile a day for exercise. (R. at 37.) The ALJ also examined a function report in which Plaintiff's mother stated that Plaintiff attended to her personal care, prepared simple meals in the microwave, drove and went outside daily, made her bed in the morning, shopped and was capable of going out alone, visited her boyfriend's house, went to the market, spent time with others in person and on the phone, and walked half a mile before stopping. (R. at 37.) He concluded that her "primary difficulty appear[ed] to be maintaining consistency in her efforts." (R. at 37.)

Plaintiff also relies on *Kneeland v. Berryhill*, 850 F.3d 749 (5th Cir. 2017), to assert that the ALJ erred by failing to address or mention Plaintiff's mother's testimony and written statements.

---

[4] Plaintiff asserts that the ALJ did not specifically reference which Metrocare record reported improved sleep. (doc. 18 at 27.) The record indicates multiple occasions wherein Plaintiff visited Metrocare and reported sleeping better, however. (R. at 473, 582, 619, 817, 848, 944, 954, 963.)

(doc. 18 at 28-29.)  In that case, the Fifth Circuit held that it was error for the ALJ to fail to address or mention the opinion of an *examining physician*. *Kneeland*, 850 F.3d at 761.  Moreover, Plaintiff's mother's testimony only reiterated what was said during Plaintiff's testimony, which the ALJ addressed, and the ALJ also took Plaintiff's mother's written statements into account in making his decision.  (*See* R. at 37, 70-73.)

Additionally, in determining her RFC, the ALJ considered in detail the various medical opinions from Metrocare and the SAMCs, and the entire record.  (R. at 36-39.)  He also expressly considered Plaintiff's testimony and that of her mother about her abilities, daily routine, and sleep habits.  (R. at 37, 70-73.)  A reviewing court must defer to the ALJ's decisions.  *See Leggett*, 67 F.3d at 564.  Accordingly, remand is not required on these issues.

### 3.    Medication Side Effects

Plaintiff asserts that the ALJ did not evaluate whether the side effects of her medications contributed to her excess sleep.  (doc. 18 at 29.)  She relies on the side-effects as listed in the Physician's Desk Reference.  (*Id*. at 29-30.)

 As part of the disability determination, the ALJ is required to consider "the type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [ ] pain or other symptoms."  *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (alterations in original) (citing 20 C.F.R. § 404.1539(c) (3)(iv)); *see also* SSR 96–7p.  Social Security Regulation 96–8p also directs that "the RFC assessment must be based on all of the relevant evidence in the case record, including the effects of treatment and the limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication."  *Brown v. Barnhart*, 285 F. Supp. 2d 919, 935 (S.D. Tex. 2003) (internal quotation

marks omitted).  Consequently, when a claimant complains of medication side effects and the ALJ

fails to evaluate those side effects and their impact on the claimant's RFC, he commits error. *Id.*

Here, the ALJ noted that Plaintiff testified she sleeps thirteen hours a day because of her

medication.  (R. at 37.)  She never stated that side effects of her medications made her sleepy,

however.  (R. at 106.)  She consistently testified that the medications did not cause her any side

effects.  (R. at 79, 96, 103.)  Additionally, she never reported feeling sleepy because of her

medications when she went to her medical appointments.  On only one occasion did she report

feeling "dopey" while on Thorazine, but that medication was discontinued as soon as she reported

its side effects.  (R. at 701, 706, 726.)  The ALJ did not err by failing to determine whether any side

effects of Plaintiff's medications contributed to her excessive sleep, and remand is not required.

### 4.    Medical Opinions

Plaintiff asserts that because the ALJ rejected Dr. Mirzatuny and Nurse Settlage's opinions

in the "Medical Assessment of Ability to do Work-Related Activities (Mental)" regarding her

limitations in sustaining work, without identifying another treating or examining physician's opinion

that contradicted their opinions, the ALJ was required to go through a *Newton* analysis.  (docs. 18

at 31-32; 20 at 2-4.)

Determination of an individual's RFC should be based on all of the relevant evidence in the

case record, including opinions submitted by treating physicians or other acceptable medical

sources.  20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.  Every medical opinion

is evaluated regardless of its source, but the Commissioner generally gives greater weight to

opinions from a treating source.  20 C.F.R. § 404.1527(c)(2).  A treating source is a claimant's

"physician, psychologist, or other acceptable medical source" who provides or has provided a

claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2).

If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6). The "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. . . . [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, 1994 WL 499764, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). If the evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* at 455; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981) (per curiam).

31

A factor-by-factor analysis is unnecessary when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Newton*, 209 F.3d at 458. "[A]bsent reliable medical evidence from a treating or examining physician *controverting the claimant's treating specialist*, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453 (emphasis added).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* (citations omitted) Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a

conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

In his decision, the ALJ examined the opinions of Dr. Mirzatuny and Nurse Settlage in their medical assessment in depth. (R. at 38.) He discussed their findings and weighed their opinions against the medical opinions and treatment notes from other physicians and nurses who treated or examined Plaintiff, and had specific medical bases for contrary opinions. (R. at 38.) Nurse Settlage's own treatment notes from her multiple follow-up visits with Plaintiff were part of his assessment. (R. at 38.) The ALJ noted that the treatment notes routinely indicated that Plaintiff was independent in attending to daily living activities and consistently denied suicidal or homicidal ideation. (R. at 38.) She was also consistently adequately groomed and cooperative, and exhibited normal psychomotor activity, normal speech, organized thought process, euthymic affect, orientation times four, intact memory, and normal attention, insight, and judgment. (R. at 38.) He further noted Dr. Khan's opinion that her "'voices' did not classically fit into a true auditory hallucination description but sounded more like loud thoughts." (R. at 38.) After weighing these opinions, he specifically found that "[d]ue to the inconsistencies between the progress notes and the extreme limitations found by Dr. Mirzatuny" and Nurse Settlage, he was "able to give only little weight" to their opinions. (R. at 38.) As noted, a reviewing court defers to the decisions of the ALJ. *See Leggett*, 67 F.3d at 564. Accordingly, although the ALJ did not give controlling weight to Dr. Mirzatuny and Nurse Settlage's medical opinions in the medical assessment, he did not need to go through the *Newton* factors. *See* 20 C.F.R. § 404.1527(d)(2).

Because the ALJ afforded the appropriate weight to the treating physicians' opinions and substantial evidence exists to support the ALJ's decision, remand is not required.

## III.    RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that the final decision of the Commissioner be **AFFIRMED**.

**SO RECOMMENDED**, on this 2nd day of March, 2018.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE